**[J-39-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


COMMONWEALTH OF PENNSYLVANIA,     :    No. 47 MAP 2017
                                        :
            Appellee                :    Appeal from the Order of the Superior
                                         :    Court at No. 1572 MDA 2015 dated
                                         :    March 3, 2017 Affirming the
             v.                      :    Judgment of Sentence of the Dauphin
                                         :    County Court of Common Pleas,
                                         :    Criminal Division, at No. CP-22-CR-
DOMINIC S. BURNO,                   :    0005415-2014 dated August 26, 2015
                                         :
            Appellant              :    ARGUED:  May 17, 2018


**CONCURRING STATEMENT**

**JUSTICE WECHT**                                            **FILED:  August 21, 2018**

       While I agree with my colleagues that we granted review improvidently in this case,

I nonetheless believe that the concerns that originally prompted us to take the case

warrant comment.  Because they bear some relation, I discuss both topics below.

       Dominic Burno has challenged the sufficiency of the evidence to support his

conviction for the crime of criminal trespass, which is defined in relevant part as follows:

**(a) Buildings and occupied structures.--**

(1) A person commits an offense if, knowing that he is not licensed or
privileged to do so, he:

(i) enters, gains entry by subterfuge or surreptitiously remains in any
building or occupied structure or separately secured or occupied
portion thereof; or

(ii) breaks into any building or occupied structure or separately
secured or occupied portion thereof.

18 Pa.C.S. § 3503.

Burno contends that he and several others were parties to an oral lease with Donna Rayson-Hutchinson, which established his legal tenancy in the residential property as to which he was convicted of trespass. As a tenant, he argues, he was licensed and/or privileged to occupy the property, precluding the jury from concluding that he knew that he had no such license or privilege. Put simply, if Burno had license or privilege, then, as a matter of both law and common sense, no jury could convict him of trespass. *Cf. Commonwealth v. Burford*, 73 A. 1064 (Pa. 1909) (holding that a conviction for trespass cannot stand where the landowner has entered into any contract with the other person giving him the right of entry or occupancy). Accordingly, Burno could not be convicted of criminal trespass, and could be removed from the property only pursuant to the protections of the Landlord and Tenant Act of 1951, 68 P.S. §§ 250.101, *et seq.* ("LTA"),[1] which prescribes a rigorous and exclusive procedure for the eviction of a tenant.[2]

Burno's Petition for Allowance of Appeal reflected this understanding of his argument. As presented, Burno's issue presupposes his legal tenancy in the property. Specifically, he sought, and this Court granted, allowance of appeal as to the following question, taken verbatim from his Petition for Allowance of Appeal:

> Whether the Superior Court erred in concluding that the evidence was sufficient to convict [Burno] of criminal trespass, *where the evidence showed that [Burno] was a tenant of the residence at issue* and had not

---

[1]    Act of April 6, 1951, P.L. 69, art I, § 101.

[2]    *See* 68 P.S. §§ 250.501, 502, 503; *see generally Nellom v. Borough*, Civ. No. 12-4627, 2012 WL 6525668, at *3 n.13 (E.D.Pa. Dec. 13, 2012) (summarizing the eviction process).

been properly evicted pursuant to the [LTA] prior to the criminal action having been filed against him?

*Commonwealth v. Burno*, 170 A.3d 1028 (Pa. 2017) (*per curiam*) (emphasis added).

Only a barebones account of the facts, which we must view in the light most favorable to the Commonwealth, need be recited.[3]   Brenda Hoffman engaged in discussions with Hutchinson concerning a living arrangement in a home owned by Hutchinson.  Specifically, in exchange for her tenancy in the home, Hoffman agreed to cover a certain number of Hutchinson's mortgage payments and perform certain repairs on the property.  The discussions in question occurred solely between Hutchinson and Hoffman.  Moreover, when the agreement soured, Hutchinson dealt solely with Hoffman, and Hoffman characterized the obligations in lieu of rent as her own.  However, several other people were present for the property walk-through and when the oral agreement was struck following Hutchinson's and Hoffman's negotiation, including Burno (Hoffman's boyfriend at the time) and Chris Hodges.  Hutchinson undisputedly understood that they and others intended to live in the home with Hoffman.

The difficulty that arises upon review of the record, performed with due regard to our deferential standard of review,[4] is that Burno's putative legal tenancy cannot be taken

---

[3]    A fuller account of the underlying events may be found in the Superior Court's memorandum decision.  *See Commonwealth v. Burno*, 1572 MDA 2015, 2017 WL 838233 (Pa. Super. Mar. 3, 2017).

[4]    "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. . . .  When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution

as given.  While the record certainly enabled a jury to find factual predicates that would support a judicial finding that Burno was a party to an oral lease with the concomitant right to possess the property, the record did not compel the jury to do so.  Consequently, our standard of review obligates us to assume that the jury did not share Burno's view of his legal relationship with Hutchinson.

"[A] lease is in the nature of a contract and is to be controlled by principles of contract law."  *Pugh v. Holmes*, 405 A.2d 897, 903 (Pa. 1979).  Whether an oral contract has been formed, and the contours of any such agreement, present questions of law for the court to answer.  *See Witten v. Stout*, 131 A. 360, 361 (Pa. 1925).  However, the court's legal interpretation of the existence and nature of a given oral agreement hinge first and foremost upon the findings of fact that provide the circumstances against which the legal question must be resolved.  *See GMH Assocs., Inc. v. Prudential Realty Grp.*, 752 A.2d 889, 898 (Pa. Super. 2000) ("In the case of a disputed oral contract, what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact."); *cf. Thatcher's Drug Store of West Goshen, Inc. v. Consol. Supermarkets, Inc.*, 636 A.2d 156, 160 (Pa. 1994) (embracing the same distinction between questions of law and the fact-finding necessary to enable legal determinations in the related context of promissory estoppel).

Here, the procedural posture—*i.e.*, a sufficiency of the evidence challenge to a criminal conviction—requires us to construe all such facts in favor of the Commonwealth.

---

the benefit of all reasonable inferences to be drawn from the evidence."  *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

Accordingly, we must focus solely upon the evidence that militates in favor of a finding that Burno had no license or privilege to the property at the relevant time. This entails construing the evidence in favor of finding no understanding, no *quid pro quo*, between Hutchinson and Burno that would support the legal conclusion that they intended to enter, or by conduct entered, into a legally binding oral lease supported by an offer, an acceptance, and an exchange of consideration—that their intent to be bound was demonstrated in their words or deeds. *See Pulse Techs., Inc. v. Notaro*, 67 A.3d 778, 783 (Pa. 2013); *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 659 (Pa. 2009) (holding that the intention to enter into a contract may be inferred "from acts in the light of the surrounding circumstances"); *see also Rambo v. Greene*, 906 A.2d 1232, 1236 (Pa. Super. 2006) (holding that "objective manifestations" may establish an intent to be bound absent a formal "meeting of minds").

The nature of the relationship between Hutchinson and Burno was anything but uncontested. The testimony regarding the facts and circumstances of the agreement pursuant to which the living arrangement at issue came to be were consistent with the conclusion that the oral lease negotiated by Hutchinson and Hoffman vested Burno with a legal tenancy.[5] Unfortunately for Burno, the testimony also was consistent with the

---

[5] *See, e.g.*, Notes of Trial Testimony at 12-13 (Hutchinson indicating her understanding that "[Hoffman], her boyfriend [Burno], my nephew Chris, his wife Kayla, and sometimes [Hoffman's] other daughter would be there"), 71-73 (Hutchinson testifying that Burno received mail and utility bills in his name), 167 (Hoffman testifying that "[t]he agreement was that [Burno] and I, my youngest daughter, Jalyn, would move into the property, and Kayla and Chris would continue to live there, and we would pay the amount

contrary conclusion—that only Hutchinson and Hoffman agreed to the terms of the lease as asserted herein, notwithstanding Hutchinson's foreknowledge that Hoffman would allow others to live with her in the residence under the umbrella of *her* lease agreement with Hutchinson.[6]  Furthermore, although Burno's exclusive reliance upon the assumed premise of tenancy renders this issue moot, the testimony also provided ample basis for a jury to conclude that, not only was Burno not licensed or privileged to remain on the property after Hoffman and the others left, but he *knew* that he lacked such license or privilege.[7]

---

of [Hutchinson's] mortgage payment"), 217 (Burno testifying that "[w]e all had an agreement").

[6]     *See*, *e.g.*, Notes of Trial Testimony at 11 (Hutchinson testifying that "[i]t was [Hoffman] who wanted to rent the place," and that "[w]e entered into an agreement where she would pay the mortgage and the utilities, and she would do whatever repairs needed to be done"), 12 (Hutchinson agreeing that it was Hoffman's "idea to do the repairs," that "[Hoffman] wanted to move into the house," and that Hutchinson did not think it was "necessary" to "write up a lease to have her sign"), 100 (Christopher Hodges testifying that, as far as he was aware, the "agreement" was "between" Hutchinson and Hoffman, and that Hodges was neither doing repair work nor paying rent), 180-81 (Hoffman again testifying in terms suggesting that she alone was bound to Hutchinson, that Hutchinson and Burno had no "independent conversations" about the agreement, and that Burno was merely "present" during Hoffman's phone conversations with Hutchinson).

[7]     *See*, *e.g.*, Notes of Trial Testimony at 17 (Hutchinson testifying that, when she found Burno at the property after she had asked everyone to leave, she informed him that "[w]hen I come back I don't want you in here," and he responded, "Okay.  I understand"), 20 (Hutchinson: "He was trying to convince me that I should let him stay.  I said no."), 83 (responding "no" to the question whether from February to July (*i.e.*, after Hoffman and the others left) she ever gave Burno permission to remain in the house), 101 (Christopher Hodges testifying that in February Hoffman told them they had to move out, and that Hodges' understanding was "that everybody had to leave").

These discrepancies necessarily render any legal opinion we issue on a question that assumes Burno's legal tenancy provisional and advisory. However, it is not our practice to render such opinions.[8] Consequently, I agree with my fellow Justices that we granted review improvidently, because the question we sought to consider depends upon a premise that our standard of review precludes us from accepting as true, rendering any putative decision hypothetical at best.

I write separately because I find it regrettable that this circumstance precludes us from reaching a question of importance to many residential renters in Pennsylvania. The law recognizes the home as sacrosanct, an overarching principle evident in everything from the law governing search and seizure[9] to mortgage foreclosure[10] to eviction. In the realm of residential leases, in particular, the law, both statutory and common, long has resisted landlord "self-help" in its multifarious forms.[11] Many of these appeared in this

---

[8] *See Phila. Entm't & Dev. Partners, L.P. v. City of Phila.*, 937 A.2d 385, 392 (Pa. 2007) ("[C]ourts should not give answers to academic questions or render advisory opinions or make decisions based on assertions as to hypothetical events that might occur in the future.").

[9] "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013).

[10] *See Bennett v. Seave*, 554 A.2d 886 (Pa. 1989) (reviewing the suite of statutory protections against foreclosure that ensure that debtors have every opportunity to avoid the loss of their homes).

[11] *See Smith v. Coyne*, 722 A.2d 1022, 1024-25 (Pa. 1999) ("With the passage of the [LTA], the landlord's common[-]law remedies to regain possession of his property were severely limited. Common[-]law remedies included self-help, distraint, and confession of judgment, all of which were modified by the [LTA] and by the forty years of case[ ]law and rules changes which followed it. . . . [T]he federal courts have imposed significant

case—Hutchinson's unilateral cancellation of essential utility services, her efforts to secure the residence against Burno's entry, and, of course, her engagement of the criminal justice system.[12]  To enshrine this principle, the General Assembly long ago implemented the time-consuming and demanding eviction procedure prescribed by the LTA, which undisputedly applies when a legal tenancy is established.  *Cf.* 68 P.S. § 250.602 ("It is intended that this act shall furnish a complete and exclusive system in itself.").  Those protections must not be discarded lightly.

Concurring and dissenting below in this case, President Judge Emeritus Bender observed, and I agree, that "[e]viction cases . . . should be brought by aggrieved landlords in the appropriate civil forum, as opposed to burdening and abusing the criminal justice system."  *See Commonwealth v. Burno*, 1572 MDA 2015, 2017 WL 838233, at *7 (Pa. Super. Mar. 3, 2017) (Bender, P.J.E., concurring and dissenting).  But it is not just the criminal justice system that is abused.  If criminal trespass is allowed to displace the LTA in close cases, it signals to landlords *and* law enforcement authorities that resort to the Crimes Code presents a ready alternative to engaging the LTA's more laborious, time-consuming process, with potentially injurious consequences for tenants who are legally entitled to the LTA's protections.

---

restrictions on the landlord's right to self-help, *Williams v. Guzzardi*, 875 F.2d 46 (3d Cir. 1989).").

[12]    That being said, Burno's undisputed, illegal reactivation of the water service and forced entries into the home further illustrated his awareness that any license or privilege he once had to enter the home had been revoked.

The LTA eviction process provides an important bulwark against precipitous and mis- or malfeasant evictions. Consequently, it is imperative that Pennsylvania law enforcement authorities and courts remain vigilant for such abuses, examining criminal prosecutions arising from circumstances similar to these with great skepticism, and that they err in favor of the LTA's protections wherever they may apply.